IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ALBERT PURVIS,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )      CASE NO. CV417-211
                                        )
CERES MARINE TERMINALS, INC.,           )
                                        )
        Intervenor,                     )
                                        )
and                                     )
                                        )
MAERSK LINE A/S,                        )
                                        )
        Defendant.                      )
                                        )

## O R D E R

Before the Court are Defendant Maersk Line A/S
("Defendant Maersk")'s Motion to Strike Undeclared Medical
Expert Testimony and Partial Motion for Summary Judgment
(Doc. 45) and Motion for Summary Judgment (Doc. 46). For the
following reasons, Defendant's Motion for Summary Judgment
(Doc. 46) is **GRANTED**. As a result, Defendant's Motion to
Strike Undeclared Medical Expert Testimony and Partial
Motion for Summary Judgment (Doc. 45) is **DISMISSED AS MOOT**.
The Clerk of Court is **DIRECTED** to close this case.

## BACKGROUND

This case arises from an injury Plaintiff Albert Purvis sustained while employed as a longshoreman. On December 30, 2015, Plaintiff and his crew of longshoreman were unloading cargo from the M/V Anna Maersk (the "Vessel"). (Doc. 48 at ¶ 1.) The Vessel is owned by Defendant Maersk. (Doc. 53 at 2.) Plaintiff, a senior leader within his union, gave his crew the safety briefing on that day and was working as a lasher—a part of a cargo unloading crew. (Id. at ¶¶ 2-3.) Prior to December 30, 2015, Plaintiff had worked on the Vessel at least ten times in the past. (Id. at ¶ 4.) Plaintiff was injured when he traversed through a manhole and the hatch cover of the manhole struck his head.[1] (Id. at ¶ 11.) The Captain of the Vessel, Roy Whelan, testified that hatch covers generally operate as follows:

> A.  Generally speaking we climb up the ladder, the lid would be closed above us. We push it up. And then you click onto the retaining lever. And we would, I would personally then just engage it just to make sure it's not going to, give it a pull before I came through.

---

[1] The parties sometimes refer to this as a manhole cover, hatch cover, or a booby hatch cover. The Court refers to it as a hatch cover.

```
Q.    Is the retaining lever also known
      as a safety lock pin?
A.    Yes.
Q.    It is also known as a latch?
A.    Yes.
```

(Id. at ¶ 5.) Manholes are used to climb between levels of a vessel and Plaintiff has used the hatch covers of the manholes as well as the latching mechanism multiple times before. (Id. at ¶ 6.) Plaintiff also admits that he knows what a hatch cover looks like when they are latched and when they are not. (Id. at ¶ 7.) Plaintiff also admits that he knows to close the latch of a hatch cover and secure it. (Doc. 48 at ¶ 7.) Plaintiff admits that he did not visually inspect the hatch cover before going through it. (Id. at ¶ 20.)

On the day of his accident, Plaintiff climbed up through a manhole once, worked on the upper level, and then climbed back down through the manhole to retrieve a tool. (Doc. 48 at ¶ 9; Doc. 53, Attach. 4 at ¶ 9.) Plaintiff then began traveling back up towards the manhole and was struck in the head by the hatch cover on his second trip up the ladder and third time through the manhole. (Doc. 48 at ¶ 11; Doc. 53, Attach. 4 at ¶ 11.) The blow resulted in Plaintiff falling to the platform below. (Doc. 53 at 3.) Other than

Plaintiff, no one witnessed his fall. (Id. at 4.) Plaintiff claims that, as a result of this incident, he suffered spinal cord compression in his neck which required a multi-level cervical discectomy and fusion surgery. (Id.) Additionally, due to his injuries, Plaintiff was unable to work for a year. (Id.)

In its Motion for Summary Judgment (Doc. 46), Defendant maintains that it did not breach any duty owed to Plaintiff. First, Defendant argues that it did not violate the duty to turnover a reasonably safe ship because the alleged defect that injured Plaintiff, the open and unlatched hatch cover, was open and obvious. (Doc. 46 at 15.) Defendant also argues that it did not breach the active control duty because there is no evidence that its crew members exercised control over the longshoremen's work. (Doc. 46 at 13-14.) Finally, Defendant contends that there was no duty to intervene because none of its crewmembers were present or observing Plaintiff's performance of his work. (Doc. 46 at 14-15.)

Plaintiff, however, argues that the turnover duty was violated because (1) the subject hatch was defective, or (2) even if the latch was not defective, Defendant's crew

members "must have" opened the hatch cover and left it unlatched and thereby created an unreasonable hazard. (Doc. 53 at 9-12.) Plaintiff does not offer any arguments that Defendant breached the active control duty. Plaintiff does, however, maintain that Defendant had a duty to intervene in that Defendant had a duty to close the hatch cover, ensure that the hatch cover latch was engaged and secure, or replace the hatch. (Doc. 53 at 12.)

In its Motion to Strike Undeclared Medical Expert Testimony and Partial Motion for Summary Judgment, Defendant argues that it is entitled to summary judgment on any medical expenses Plaintiff claims as damages beyond his immediate, short-term treatment including, but not limited to, a spinal surgery that Plaintiff underwent. (Doc. 45 at 2.) Defendant also requests that this Court strike any medical experts proffered by Plaintiff because Plaintiff did not declare any medical experts either by the court set deadline of February 28, 2018 or by the time Defendant filed its motion on August 17, 2018. (Id.) Because this Court grants Defendant's Motion for Summary Judgment (Doc. 46),

the Court does not address Defendant's motion to strike and partial motion for summary judgment.

## ANALYSIS

I.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an

element is essential. <u>DeLong Equip. Co. v. Wash. Mills</u>

<u>Abrasive Co.</u>, 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears
> the initial responsibility of informing the
> district court of the basis for its motion, and
> identifying those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, which it believes
> demonstrate the absence of a genuine issue of
> material fact.

<u>Celotex</u>, 477 U.S. at 323. The burden then shifts to the

nonmovant to establish, by going beyond the pleadings, that

there is a genuine issue as to facts material to the

nonmovant's case. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604,

608 (11th Cir. 1991). The Court must review the evidence and

all reasonable factual inferences arising from it in the

light most favorable to the nonmovant. <u>Matsushita</u>, 475 U.S.

at 587-88. However, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the

material facts." <u>Id.</u> at 586. A mere "scintilla" of evidence,

or simply conclusory allegations, will not suffice. <u>See,</u>

<u>e.g.</u>, <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th

Cir. 1998). Nevertheless, where a reasonable fact finder may

"draw more than one inference from the facts, and that

inference creates a genuine issue of material fact, then the

Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989).

II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    A. <u>Liability Under The Longshore And Harbor Workers' Compensation Act</u>

Section 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950 authorizes suits by Longshoremen injured due to the negligence of a shipowner or charterer. The Supreme Court, however, has significantly narrowed the duties a shipowner or charterer owes to longshoremen under the LHWCA. First, "a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know." <u>Roach v. M/V Aqua Grace</u>, 857 F.2d 1575, 1581 (11th Cir. 1988) (citing <u>Scindia Steam Navigation Co. v. De Los Santos</u>, 451 U.S. 156, 166-67 (1981)). Second, there is generally no duty to supervise the stevedore during cargo loading, " 'absent contract provisions, positive law, or custom to the contrary.' " <u>Id.</u> (quoting <u>Scindia</u>, 451 U.S. at 172). In this respect, the shipowner or charterer is permitted to "rely on the

8

stevedore to perform its work with reasonable care." Id. (citing Scindia, 451 U.S. at 172). Once cargo loading is underway, however, the shipowner or charterer may be liable if it "actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167. Lastly, the shipowner has a duty to intervene only when it becomes aware that the ship or its equipment poses a danger to the stevedore, and that the stevedore is acting unreasonably to protect the longshoremen. Roach, 857 F.2d at 1581 (citing Scindia, 451 U.S. at 178).

### 1. Turnover Duty

With respect to the turnover duty, a shipowner is required to

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the

> exercise of ordinary care" to carry on
> cargo operations "with reasonable
> safety to persons and property."

Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98, 114

S. Ct. 2057, 2063, 129 L. Ed. 2d 78 (1994) (quoting Fed.

Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S.

404, 416 n.18 (1969)). In its motion, Defendant contends

that it did not violate the duty to turnover a reasonably

safe ship and argues that the condition that injured

Plaintiff, the open and unlatched hatch cover, was open and

obvious. (Doc. 46 at 15.) Plaintiff, however, contends that

Defendant breached the turnover duty because the subject

hatch was defective, or, even if the latch was not

defective, Defendant's crew members "must have" opened the

hatch cover and left it unlatched and thereby created an

unreasonable hazard. (Doc. 53 at 9-12.)

First, in regards to the hatch cover being defective,

Defendant argues that there is no evidence in the record

that the hatch cover was defective and cites to Plaintiff's

own deposition in which Plaintiff stated that he did not see

any defect with the hatch cover or the latching mechanism,

the lack of any records reporting a defect with the hatch

cover, and the lack of any expert testimony regarding a defect. (Doc. 46 at 18.) Defendant also cites to the deposition testimony of its marine surveyor expert, Decatur Austin, who inspected the hatch cover and testified that the hatch cover was in good working order and the deposition testimony of the Vessel's captain, Roy Whelan, who testified that his crew members investigated the hatch cover the day after the accident and found it to be in good working order. (Id.)

Plaintiff claims that the subject hatch cover is on the offshore side of the Vessel, not the inshore side, and was not the one that was investigated by the Vessel's crew and examined by Mr. Austin. (Doc. 53 at 6-7.) Essentially, Plaintiff maintains that the subject hatch cover that Defendant's motion is premised on is the wrong hatch cover and that the actual hatch cover that injured Plaintiff, which was on the offshore side of the Vessel, was defective. (Id.) In support of this contention, Plaintiff only cites to two arguable pieces of evidence: a video that he and his counsel, Samuel Mikell, took on June 5, 2018 when the pair boarded the Vessel to inspect the hatch cover and

Plaintiff's deposition in which he testified that "something" must have been wrong with the hatch cover because it injured him. (Id. at 5-6.)

First, despite Plaintiff's contention otherwise, the video does not create a genuine issue of material fact that the hatch cover was defective when it injured Plaintiff. Plaintiff testified in a later filed affidavit that the hatch in the video is the subject hatch that injured him. (Doc. 59, Attach. 1 at 1.) The video (Doc. 52) depicts Mr. Mikell touching and manipulating the hatch cover latch and then raising an adjacent yellow metal bar and letting it fall. Mr. Mikell raises the adjacent yellow metal bar and lets it fall twice without the hatch cover falling or moving. Mr. Mikell then manipulates the hatch cover latch a second time and raises the yellow metal bar and lets it fall which causes the hatch cover to fall. Plaintiff summarizes the video as follows:

> The potential faultiness of any particular latch is consistent with a short video taken during Plaintiff's counsel Sam Mikell's inspection of the exact hatch cover which Mr. Purvis testified fell on his head. As one can see, the video shows Mr. Mikell manipulating the hatch cover. At the end of the video, from 00:17 to 00:24,

> Mr. Mikell engages the latch such that the hatch cover is standing upright. Then, however, to test the integrity of the latch, Mr. Mikell slightly lifts the adjacent metal bar and lets it back down, causing the latch to disengage, and the hatch cover to fall. Thus, a slight vibration near the hatch cover caused the latch to fail and the hatch cover to fall, just as it did on Mr. Purvis' head.

(Id. at 5 (internal citations omitted).)

Defendant objected to the video's admissibility on the grounds that the video (1) is not authenticated; (2) is not reliable; (3) is not filmed by an expert; (4) is not discussed by an expert; (5) is not vetted under Daubert; (6) is not filmed in the same conditions as the incident; (7) does not show the manhole cover at issue; (8) employs no scientific methodology; and (9) asks Plaintiff's lawyer to impermissibly serve as a witness. (Doc. 57 at 9.) After Defendant challenged the admissibility, Plaintiff's counsel filed Plaintiff's affidavit in which he testified that he and Samuel Mikell "boarded the M/V ANNA MAERSK to inspect the hatch cover that fell and hit me in the face." (Doc. 59, Attach. 1 at 1.) He also testified that he had previously used smart phones to record videos and that the video had

not been altered between the time it was recorded and the time it was filed into the record. (Id. at 2.)

However, even assuming, without deciding, that the video is admissible,[2] Plaintiff has still failed to establish the presence of a genuine issue of material fact. Viewing the facts in the light most favorable to Plaintiff, Plaintiff has not produced evidence that the hatch cover was defective at the time of his injury. Plaintiff was injured on December 30, 2015 (Doc. 53 at 2) and the video was taken on June 5, 2018 (Doc. 59, Attach. 1 at 1). While Plaintiff testified in his affidavit that the hatch recorded was the subject hatch that hit him, Plaintiff does not state that the hatch was in the same or similar condition that he encountered nearly three years prior. Further, from the record, it appears that Plaintiff is unable to testify as such because Plaintiff unequivocally stated that he did not

---

[2] The Court has serious reservations about the admissibility of the video submitted by Plaintiff. Plaintiff claims that the video shows the defective nature of the hatch but there is no accompanying testimony to explain what is occurring in the video—e.g. why the hatch cover fell on the third attempt but not the first two, how the hatch cover would operate absent the defect, or even what the defect is. The person who performed the examination and could possibly answer these questions is Plaintiff's attorney, who is not an expert or knowledgeable in ship hatch covers.

observe the hatch cover. Plaintiff admits that he did not visually inspect the hatch cover. (Doc. 48 at ¶ 20; Doc. 53, Attach. 4 at ¶ 20.) When asked whether one could look at a hatch cover and tell if the locking pin is down, he testified that "I mean, you, you could. I mean, that particular day I didn't look at that." (Doc. 46, Attach. 1 at 14.) He also testified the following:

> Q. Okay. You're not contending that the latch-the locking pin was down and somehow malfunctioned, are you? Or do you know?
> A. I don't know if it was up or down.
> Q. Okay.
> A. All I know is it fell when I came up.

(Id. at 16.) Even accepting as true that the subject hatch cover that injured Plaintiff is the one depicted in the video, Plaintiff has not shown that the allegedly defective hatch cover in the video was in that condition when he encountered it in 2015. It could have become defective in the nearly three intervening years.

Plaintiff, however, contends that he did testify that the hatch cover was not working properly—Plaintiff cites to his own deposition where he stated "if [the hatch cover] was locked it shouldn't have hit me in the face." (Doc. 53 at 11

(quoting Purvis Dep. at 36:7-8).) However, this is pure speculation. During Plaintiff's deposition, the following exchange demonstrates that Plaintiff did not see any defect:

> Q.  Did, did you see anything wrong with the hatch cover on, on the ship at issue, the incident?
> A.  I didn't see anything wrong with it. I didn't see anything wrong with it. But I mean, if it was locked it shouldn't have hit me in the face.

(Doc. 46, Attach. 1 at 10.) As previously discussed, Plaintiff admits elsewhere in his deposition that he did not look at or check the latch.  (Doc. 46, Attach. 1 at 14.) Simply put, the only evidence Plaintiff advances that the hatch cover was defective is the video filmed by Plaintiff and his counsel and Plaintiff's speculation that something must have been wrong with the hatch cover. Plaintiff cites to no records or other testimony that demonstrate the defectiveness of the hatch cover. This is insufficient to withstand Defendant's motion for summary judgment. Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief,

rather than personal knowledge, are insufficient to withstand a motion for summary judgment.").

Plaintiff also argues that Defendant's crew members had constructive knowledge of the defective latch because the Defendant's Safety Area Inspection reports reported defective latches on a regular basis. (Doc. 53 at 10.) Thus, according to Plaintiff, "even if no Maersk crew member reported the defect with this specific latch, the regularity of problems with hatch cover latches generally gave constructive notice of the defect." (Id.) "Absent actual knowledge of a hazard, then, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." Howlett, 512 U.S. at 100, 114 S. Ct. at 2064. However, for the reasons addressed above, Plaintiff has not provided any evidence that the hatch cover was defective on the night of Plaintiff's injury and, thus, there can be no duty to warn of a danger that Plaintiff cannot show existed at the time of injury.

Plaintiff also argues that, even if the latch was not defective, Defendant nevertheless violated the turnover duty

because Defendant's crew members "must have" opened the hatch cover, left it unlatched and thereby created an unreasonable hazard. (Doc. 53 at 11-12.) This argument fails. First, Plaintiff presents no evidence that it was Defendant's crew that first opened the hatch. (Doc. 46, Attach. 1 at 36.) Second, it is well established that the turnover duty "attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." Howlett, 512 U.S. at 99, 114 S. Ct. at 2064. Plaintiff testified that a person could see if the locking pin was down on a hatch cover if it was visually inspected (Doc. 46, Attach. 1 at 14), that he has had issues in the past with hatch covers not working properly and described some of the issues that he has encountered (Id. at 10), and that if the crew saw a latch that was not working properly, he would sometimes get maintenance to fix it or he would otherwise address the issue (Id.). Accordingly, an open and unlatched hatch cover is an open danger and a competent stevedore is accustomed to traversing hatch covers during the course of performing his duties. A shipowner only

has a duty to turn over the ship " 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.' " Howlett, 512 U.S. at 98, 114 S. Ct. at 2063 (quoting Fed. Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 89 S. Ct. 1144, 22 L.Ed.2d 371 (1969)). Plaintiff has not provided any evidence that an expert and experienced stevedore could not, by the exercise of ordinary care, carry on cargo operations due to an open and unlatched hatch cover.

In this case, there is no evidence in the record that Defendant breached the turnover duty. As noted above, Plaintiff must point to evidence establishing that an expert and experienced stevedore would not be able, by the exercise of reasonable case, to carry on its cargo operations with reasonable safety to persons and property. Howlett, 512 U.S. at 98, 114 S. Ct. at 2063. Plaintiff has failed to demonstrate that there is a genuine issue of fact as to the

turnover duty. Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's claim based on a breach of Defendant's turnover duties.

### 2.    Active Control Duty

With regards to the active control duty, Defendant contends that this duty was not breached because there is no evidence that its crew members exercised control over the longshoremen's work that would trigger the duty. (Doc. 46 at 13-14.) "A time charterer violates the active control duty under Scindia if it 'actively involves itself in the cargo operations and negligently injures a longshoreman.' " Miller v. Navalmar (UK) Ltd., 685 F. App'x 751, 755 (11th Cir. 2017) (quoting Scindia, 451 U.S. at 167, 101 S. Ct. at 1622). Plaintiff does not offer any arguments that Defendant breached this duty. Accordingly, there is no genuine issue of material fact regarding the active control duty.

### 3.    Duty to Intervene

Defendant also argues that it did not have a duty to intervene because none of its crewmembers were present or observing Plaintiff's performance of his work. (Doc. 46 at 14-15.) Plaintiff contends that Defendant breached the duty

to intervene because Defendant had a duty to either close the hatch cover, ensure that the hatch cover latch was engaged and secure, or replace the hatch. (Doc. 53 at 12.)

Once in control of a vessel, the stevedore bears the primary responsibility for the safety of the longshoremen. Lampkin v. Liberia Athene Transp. Co., 823 F.2d 1497, 1501 (11th Cir. 1987). However, a shipowner "has a duty to intervene and protect a longshoreman once cargo operations have begun even if it is not actively involved in those operations if '[the shipowner] becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen.' " Miller, 685 F. App'x at 757 (quoting Lampkin, 823 F.2d at 1501). Thus, "a shipowner only has 'a duty to intervene when it has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of obviously improvident judgment, has failed to remedy it.' " Id. (quoting Greenwood v. Societe Francaise De, 111 F.3d 1239, 1248 (5th Cir. 1997) (internal citations omitted)).

Here, Plaintiff's injury occurred after cargo operations began (Doc. 46, Attach. 1 at 36) and Defendant was not actively involved in the cargo operations (Doc. 48 at 6; Doc. 53, Attach. 4 at 4). Therefore, Plaintiff must establish that Defendant had both actual knowledge of the defective hatch cover and had actual knowledge that the stevedore, in the exercise of obviously improvident judgment, failed to remedy it. Miller, 685 F. App'x at 757. Plaintiff has provided no evidence that Defendant had actual knowledge of a defective hatch cover and even appears to admit in his response that Defendant was without actual knowledge that the hatch cover in question was defective. (Doc. 53 at 10 ("even if no Maersk crew member reported the defect with this specific latch, the regularity of problems . . . gave constructive knowledge of the defect.").) Moreover, if the hatch cover was just open and not defective, Plaintiff presented no evidence that Defendant knew of the open hatch cover or that Plaintiff had actual knowledge that the stevedore was exercising "obviously improvident judgment" by failing to remedy the open and unlatched hatch cover. Miller, 685 F. App'x at 757.

Plaintiff has failed to meet his burden to show that there is a genuine issue of material fact as to Defendant's duty to intervene. Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's claim based on a breach of the duty to intervene.

## CONCLUSION

For the foregoing reasons, Defendant Maersk's Motion for Summary Judgment (Doc. 46) is **GRANTED.** As a result, Defendant Maersk's Motion to Strike Undeclared Medical Expert Testimony and Partial Motion for Summary Judgment (Doc. 45) is **DISMISSED AS MOOT.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _30th_ day of April 2019.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA